AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Saqib Mohammad Hussain (312) 353-1414



FILED
7/22/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: 25 CR 409 |
|---|---|
| v. | **UNDER SEAL** |
| VELAR MAYFIELD, also known as "V" | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about July 10, 2025, at Sauk Village, Illinois, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, a firearm, in violation of Title 18, Unites States Code, Section 922(g)(1). |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Jon Molidor*
JON MOLIDOR
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: July 22, 2025

*Judge's signature*

City and state: Chicago, Illinois                    DANIEL P. MCLAUGHLIN, U.S. Magistrate Judge
                                                    *Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**AFFIDAVIT**

I, JON MOLIDOR, being duly sworn, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, and have been so employed since January 2024. My current responsibilities include the investigation of federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms trafficking, and violent crime.

2. As part of my duties as an ATF Special Agent, I investigate violations of federal firearms offenses, including the unlawful possession of firearms or ammunition by convicted felons, firearms trafficking, violent crime, and narcotics trafficking. I employ investigative tools such as the use of informants and witnesses, surveillance, controlled purchases of firearms and narcotics, firearms traces, and the execution of both search warrants and arrests warrants. I have participated in the execution of multiple federal search warrants related to federal firearms offenses. I have attended the Federal Law Enforcement Training Center, and I am an Honor Graduate of the ATF National Academy.

3. This affidavit is submitted in support of a criminal complaint alleging that VELAR MAYFIELD has violated Title 18, United States Code, Section 922(g)(1) (the "Subject Offense"). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging

MAYFIELD with possession of a firearm by a convicted felon, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4. This affidavit is based on my personal knowledge, my training and experience, my review of audio and audio-video recorded conversations, law enforcement records and reports, court documents, as well as other information provided to me by other law enforcement agents and confidential sources.

5. At various points in this affidavit, I refer to, and offer my preliminary interpretations of, certain recorded conversations and text message exchanges. My interpretations of these communications, some of which I have placed in brackets, are based on my knowledge of the investigation to date and my review of prior recordings, the contents and context of the conversations, prior and subsequent conversations, review of documents, information provided by confidential sources, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted. Some of these summaries do not include references to all the topics discussed during the communications. In addition, the summaries do not necessarily include references to all statements made by the speakers on the topics that are mentioned. Finally, the summaries are based on draft—not final—transcripts of the recorded conversations.

**I.  FACTS SUPPORTING PROBABLE CAUSE**

    **A.  Summary**

6. On June 3, 2025, MAYFIELD arranged for three individuals to come to MAYFIELD's residence to purchase a rifle-style firearm and ammunition for $1,500. Unbeknownst to MAYFIELD, two of the individuals were ATF confidential sources ("CS-1" and "CS-2") and the other was an undercover ATF agent ("UCO-1"). After the June 3 sale, MAYFIELD arranged for the CSs and UCO-1 to meet at MAYFIELD's residence again on June 10, where MAYFIELD sold them three firearms and ammunition for $2,220. MAYFIELD arranged for UCO-1 to meet at MAYFIELD's residence a third time, on July 10, 2025, where MAYFIELD sold UCO-1 three more firearms and ammunition for $3,400. As detailed below, MAYFIELD has three prior felony convictions for burglary, aggravated driving under the influence, and domestic battery.

    **B.  Mayfield is a Convicted Felon**

7. In and around May 2025, law enforcement received information from two confidential sources, CS-1[1] and CS-2[2], that an individual, who was later

---

[1] CS-1 has provided information to law enforcement for approximately nine years and has been paid approximately $100,000 in total during that period for his cooperation in multiple investigations, including this investigation. According to a criminal records database, CS-1 had one prior conviction for aggravated battery in 1998. Information provided by CS-1 has been reliable and credible, and certain information has been corroborated by independent investigation by law enforcement, audio/video recordings of communications with MAYFIELD and controlled purchases of firearms, and information provided by other law enforcement officials.

[2] CS-2 has provided information to law enforcement since in or around April 2025 and has been paid approximately $2,200 in total for his cooperation. According to a criminal records database, CS-2 has one prior felony conviction for strangulation in 2019 and misdemeanor

identified by CS-1 and law enforcement as MAYFIELD, was trafficking firearms in and around the Chicagoland area. According to CS-1, CS-1 had met the individual once before, and knew of him through CS-2, who told CS-1 that the individual sells firearms. CS-2 who confirmed that s/he has known the individual for years because s/he has lived in the same area as the individual and knew the individual as someone who sold firearms.

8.  CS-1 provided law enforcement with the individual's telephone number, namely, 708-980-3098 ("Subject Phone 1"), and described the individual as a black male who s/he knew as "V."

9.  On or about June 2, 2025, law enforcement showed CS-1 a photograph of MAYFIELD on record with the Illinois Secretary of State. CS-1 identified the individual depicted in the photograph as the person CS-1 knew as "V." According to CS-1, CS-1 knew V's appearance based on having previously met V and identified V as the individual that CS-2 had told CS-1 sold firearms. CS-1 told law enforcement that s/he knows V to reside at 1164 Barry Lane in Sauk Village, Illinois (the "Subject Premises").

10. Based on a review of law enforcement and court records, MAYFIELD is a convicted felon.

---

convictions for criminal trespass and traffic offenses. Information provided by CS-2 has been reliable and credible, and certain information has been corroborated by independent investigation by law enforcement, audio/video recordings of communications with MAYFIELD and controlled purchases of firearms, and information provided by other law enforcement officials.

11.     According to Will County court records, on or about September 5, 2014, MAYFIELD was convicted of felony aggravated driving under the influence in the Circuit Court of Will County, Illinois, and sentenced to 42 months' imprisonment.

12.     According to Will County court records, on or about March 14, 2017, MAYFIELD was convicted of felony domestic battery in the Circuit Court of Will County, Illinois, and sentenced to 30 months' probation.

### C. Mayfield's Possession and Sale of a Rifle at the Subject Premises on June 3, 2025

13.     Between on or about May 19, 2025, and on or about June 2, 2025, at the direction of law enforcement, CS-1 exchanged a series of recorded text messages with MAYFIELD on Subject Phone 1.[3] During these communications, CS-1 discussed the purchase of a firearm.

14.     On May 31, MAYFIELD, using Subject Phone 1, texted CS-1 that he had "something" and wanted to "see if [CS-1] was interested." MAYFIELD texted CS-1 a photograph of a 17 Design & Manufacturing LLC model IFLR-15 rifle and wrote "gotta 556 collapsible stock 5 mags [magazines] red dot sight and ammo for 13 [$13,000]." CS-1 responded that if MAYFIELD kept the gun for CS-1 until Tuesday [June 3], CS-1 would "give u [MAYFIELD] the 15 [$1,500]" for the gun and ammunition. MAYFIELD replied, "bet [okay]."

---

[3] This affidavit refers to MAYFIELD as the identified user of Subject Phone 1 based on (a) MAYFIELD selling the same type and number of firearms during each of the sales for the same price that was negotiated and agreed upon by CS-1 and the user of Subject Phone 1 prior to the sales; and (b) the user of Subject Phone 1 agreeing to conduct the June 3 and June 10 sales at the Subject Premises, and MAYFIELD being at the residence and completing the firearms sales.

15. On June 2, 2025, MAYFIELD, using Subject Phone 1, texted CS-1 that CS-1 should let MAYFIELD know when CS-1 was heading in the direction of the Subject Premises. CS-1 responded that CS-1 would come to the Subject Premises tomorrow (June 3) at around 2:00 p.m. MAYFIELD replied, "bet [okay]."

16. On or about June 3, 2025, at the direction of law enforcement, CS-1 exchanged a series of recorded text messages with MAYFIELD on Subject Phone 1.[4] During these communications, MAYFIELD confirmed that he would be "ready for" CS-1 to purchase the firearm later that day.

17. Prior to meeting with MAYFIELD on June 3, 2025, law enforcement searched CS-1 and CS-2 and found no contraband or weapons on either person. An undercover officer ("UCO-1") and CS-1 were equipped with concealed audio and video recording devices as well as an electronic transmitter.

18. In summary, based on my review of the recording and information provided by UCO-1:

---

[4] Certain conversations and communications referenced in this affidavit have been recorded and preserved. This affidavit does not notate all communications between MAYFIELD and CS-1 and between MAYFIELD and the undercover officer ("UCO-1"). Instead, the conversations are summaries of the communication. Where recorded conversations are discussed in this affidavit, the language that is quoted from the recorded conversations is based upon a preliminary review of the recorded conversations and not on final transcripts of the recorded conversations. Summaries and excerpts do not include all statements or topics covered during the course of the conversations. At various points in the affidavit, I have also included, either in brackets or summary form, my interpretation of words and phrases used in conversations. My interpretations are based on the contents and context of the conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

a. On June 3, 2025, at approximately 1:50 p.m., UCO-1 drove with CS-1 and CS-2 in UCO-1's undercover vehicle to the Subject Premises. UCO-1 parked near the Subject Premises. UCO-1, CS-1, and CS-2 got out of the undercover vehicle and walked up to the front door of the Subject Premises. MAYFIELD came outside to meet them and then invited them inside the Subject Premises. UCO-1 observed that MAYFIELD was wearing black latex gloves throughout their meeting.

b. After they entered the Subject Premises, UCO-1 observed a 17 Design & Manufacturing LLC model IFLR-15 rifle on a coffee table. MAYFIELD allowed UCO-1 and CS-1 to handle and inspect the firearm. MAYFIELD said that the price for the firearm, magazines, and ammunition was $1,500. MAYFIELD provided UCO-1 and CS-1 with eighty rounds of 5.56 caliber ammunition and four 5.56 caliber magazines as part of the sale.

c. During the transaction, CS-1 stated, "I technically can't purchase one … I'm a felon … you know what I mean." MAYFIELD responded, "I feel you [I understand]." UCO-1 and CS-1 paid MAYFIELD $1,500 for the firearm and ammunition. UCO-1 and CS-1 told MAYFIELD to contact CS-1 if MAYFIELD had any more firearms for sale. MAYFIELD said he would.

d. UCO-1 and the CSs left the Subject Premises. MAYFIELD walked with them back to the undercover vehicle and told them that he could get firearms that could legally be placed in another person's name. UCO-1 asked whether those firearms were "out of the box" [i.e., new firearms]. MAYFIELD responded that he knew someone who could buy firearms from the store. MAYFIELD stated that the

person who purchased firearms for others also "build[s] shit [builds his own firearms]." UCO-1 asked if the individual built firearms "without numbers" [firearms without serial numbers]. MAYFIELD responded that the individual did. UCO-1 asked MAYFIELD if the individual had anything available for sale. MAYFIELD responded that he would look into it. MAYFIELD said he would contact CS-1 in the future. UCO-1, CS-1, and CS-2 then left the area in the undercover vehicle with the firearm and ammunition they had just purchased from MAYFIELD. MAYFIELD went back inside the Subject Premises.

19. According to a law enforcement officer trained in determining where firearms are manufactured, the firearm MAYFIELD sold to UCO-1 and CS-1 on June 3 was manufactured outside of Illinois, and therefore, traveled in interstate commerce prior to the June 3 sale.

**D.   Mayfield's Possession and Sale of Three Firearms at the Subject Premises on June 10, 2025**

20. Between on or about June 8 and on or about June 9, 2025, at the direction of law enforcement, CS-1 exchanged text messages with MAYFIELD, using Subject Phone 1, concerning the purchase of more firearms. On June 8, CS-1 texted MAYFIELD, "[A]nything new on deck." MAYFIELD responded that he had a "Draco [Draco style 7.62 caliber pistol] for 15 [$1,500]," a "380 bodyguard [a Smith & Wesson .380 caliber pistol] for 300 [$300]," and "a 357 [a .357 caliber revolver] for for [sic] 400 [$400]."

21. On June 10, 2025, at the direction of law enforcement, CS-1 texted MAYFIELD on Subject Phone 1 to arrange for the purchase of the three firearms.

MAYFIELD, using Subject Phone 1, texted CS-1 to let him know when CS-1 was on the way. CS-1 understood MAYFIELD to mean on the way to the Subject Premises to complete the purchase.

22. Prior to meeting with MAYFIELD on June 10, 2025, law enforcement searched CS-1 and CS-2 and found no contraband or weapons on either person. UCO-1 and CS-1 were equipped with concealed audio and video recording devices as well as an electronic transmitter.

23. In summary, based on my review of the recording and information provided by UCO-1:

    a. On June 10, 2025, at approximately 5:30 p.m., UCO-1 drove with CS-1 and CS-2 in an undercover vehicle to the Subject Premises and parked nearby. MAYFIELD was in the driveway of the Subject Premises. UCO-1, CS-1, and CS-2 got out of the undercover vehicle and followed MAYFIELD into the Subject Premises.

    b. After they entered the Subject Premises, MAYFIELD gestured to the coffee table and stated, "this is a .380 … and this is a .38 special." UCO-1 observed a Smith & Wesson M&P Bodyguard .380 caliber pistol, a .380 caliber magazine, and a Weihrauch Hermann Windicator .38 caliber revolver on the coffee table. UCO-1 asked MAYFIELD where the Draco pistol was located. MAYFIELD retrieved a black backpack from under the coffee table and handed it to CS-1. CS-1 opened the backpack, inside of which UCO-1 observed a Roarm/Cugir MII II Draco, 7.62 caliber pistol, one 7.62 caliber 100 round drum magazine, and a 7.62 caliber 30 round drum magazine. UCO-1 asked for the price of all three firearms. MAYFIELD responded

"All of it … I said twenty-two [$2,200]." MAYFIELD said that the revolver and .380 caliber pistol were not his firearms. UCO-1 gave MAYFIELD $2,200 as payment for the three firearms and ammunition.

  c. During the transaction, UCO-1 observed an AR style rifle on a couch in the family room. UCO-1 asked MAYFIELD if UCO-1 could purchase that firearm as well. MAYFIELD picked up the firearm and said he had just purchased it and was not willing to sell it, but he would let UCO-1 know when he was ready to sell it. UCO-1 asked MAYFIELD contact UCO-1 directly. MAYFIELD provided UCO-1 with his phone number (i.e., Subject Phone 1). UCO-1 asked MAYFIELD to contact UCO-if he came across any other firearms for sale. MAYFIELD said his brother had a Glock .40 caliber pistol. UCO-1 again asked MAYFIELD to contact UCO-1 directly, after which UCO-1, CS-1, and CS-2 left the Subject Premises.

24. According to a law enforcement officer trained in determining where firearms are manufactured, each of the three firearms that MAYFIELD sold to UCO-1 and the CSs on June 10 were manufactured outside of Illinois, and therefore, traveled in interstate commerce prior to the June 10 sale.

### E. Mayfield's Possession and Sale of Three Firearms at the Subject Premises on July 10, 2025

25. On or about July 4, 2025, UCO-1 received a text message from phone number 464-249-1325 ("Subject Phone 2").[5] The text message provided, "Yoo [UCO-

---

[5] This affidavit identifies MAYFIELD as the user of Subject Phone 2 based on (a) Subject Phone 2's initial text to UCO-1 that the user of Subject Phone 2 is "v," a name MAYFIELD goes by, and (b) the user of Subject Phone 2 agreeing to sell UCO-1 two specific firearms for $3,400, which MAYFIELD sold to UCO-1 at the Subject Premises on July 10, 2025.

1] this v [MAYFIELD] my number." Later, on July 9, UCO-1 received another text message from MAYFIELD, using Subject Phone 2. The text message provided, "bro trying to get rid of a sig compact custom 9 [Sig Sauer 9-millimeter semi-automatic pistol], for a stack [$1,000]." MAYFIELD texted UCO-1, "lmk [let me know] when you in the area," which UCO-1 understood to mean near the Subject Premises, where the June 3 and June 10 firearms sales had taken place.

26. On July 10, 2025, UCO-1 texted MAYFIELD on Subject Phone 2 to ask whether MAYFIELD had any firearms to sell. MAYFIELD, using Subject Phone 2, responded, "1500 [$1,500] burnt gold aero precision 300 black [assault-rifle style firearm] with 2 mags [magazines]." UCO-1 replied that s/he would come to the Subject Premises later that day.

27. Prior to meeting with MAYFIELD, UCO-1 was equipped with a concealed audio and video recording device and an electronic transmitter.

28. In summary, based on my review of the recording and information provided by UCO-1:

a. On July 10, at approximately 3:18 p.m., UCO-1 arrived and parked near the Subject Premises. UCO-1 met MAYFIELD at the front door of the Subject Premises. MAYFIELD told UCO-1 to park UCO-1's vehicle in the driveway. UCO-1 parked the vehicle in the driveway and entered the Subject Premises.

b. After UCO-1 entered the Subject Premises, MAYFIELD instructed an unidentified white female to retrieve a white backpack to put the firearms in. On the coffee table in the living room of Subject Premises, UCO-1

observed a dark gold-colored Aero Precision X15 5.56 caliber rifle; an Aero Precision DTOM15 multi-caliber rifle; a Sig Sauer P365 9-millimeter pistol; 30 rounds of 9-millimeter ammunition; and four 5.56 caliber magazines. When UCO-1 picked up the 5.56 caliber rifle, MAYFIELD said, "yea that's the 300 blackout," referring to the firearm MAYFIELD had texted UCO-1 about earlier that day. UCO-1 asked if he/she would need "to take the numbers off [defacing the firearms' serial numbers]." In response, MAYFIELD said that all of the firearms were "legal." MAYFIELD added, "they all legal … shit, they ain't in my name."

      c.    UCO-1 asked MAYFIELD how much the three firearms cost. MAYFIELD agreed to sell the three firearms and ammunition to UCO-1 for $3,400. MAYFIELD also agreed to sell approximately 80 rounds of 5.56 caliber ammunition with the firearms. MAYFIELD retrieved the ammunition from a separate room toward the back of the Subject Premises. During the transaction MAYFIELD helped UCO-1 disassemble the rifles and store them in the white backpack that the unidentified female had retrieved at MAYFIELD's direction. UCO-1 paid MAYFIELD $3,400. MAYFIELD told UCO-1 that MAYFIELD would let UCO-1 know when he had additional firearms for sale.

      29.    According to a law enforcement officer trained in determining where firearms are manufactured, the three firearms that MAYFIELD sold to UCO-1 on July 10 were manufactured outside of Illinois, and therefore, traveled in interstate commerce prior to the July 10 sale.

## II. CONCLUSION

30. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that on or about July 10, at Sauk Village, in the Northern District of Illinois, Eastern Division, VELAR MAYFIELD, knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, a firearm, in violation of Title 18, Unites States Code, Section 922(g)(1).

*Jon Molidor*
JON MOLIDOR
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

SWORN TO AND AFFIRMED by telephone on July 22, 2025.

HONORABLE DANIEL P. MCLAUGHLIN
United States Magistrate Judge